**F I L E D**

Revised December 4, 2003

**November 13, 2003**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 02-60850

---

AZEL P SMITH; JACQUELINE BUTLER; RUTHIE PORTER; GLORIA
BURNS; WILLIE ALLEN; ET AL

Plaintiffs - Appellants

v.

CITY OF JACKSON, MISSISSIPPI; POLICE DEPARTMENT OF THE CITY
OF JACKSON, MISSISSIPPI

Defendants - Appellees

---

Appeal from the United States District Court
for the Southern District of Mississippi, Jackson

---

Before KING, Chief Judge, and HIGGINBOTHAM and STEWART, Circuit
Judges.

KING, Chief Judge:

Plaintiffs-appellants, thirty police officers and public
safety dispatchers employed by the defendants-appellees, the City
of Jackson and the Police Department of the City of Jackson, appeal
the district court's order granting summary judgment in favor of
the defendants. The appeal presents an issue of first impression
in our circuit regarding whether a disparate impact theory of
liability is available to plaintiffs suing for age discrimination
under the Age Discrimination in Employment Act of 1967. The
district court ruled that, as a matter of law, claims of disparate

1

impact cannot be brought under the Act. We agree and therefore affirm the judgment of the district court as to this issue. However, because the district court granted summary judgment in favor of the defendants on the plaintiffs' disparate treatment claim before addressing pending motions related to the plaintiffs' ability to fully develop the summary judgment record, we vacate the district court's final judgment insofar as it dismissed the plaintiffs' disparate treatment claim.

## I.

### PROCEDURAL HISTORY

On May 14, 2001, thirty police officers and public safety dispatchers – all over the age of forty and all employed by the defendants – filed suit pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (2000). They claimed injuries as a result of an allegedly age-discriminatory performance pay plan ("the plan") implemented by the defendants in order to grant substantially larger salary increases to police officers and public safety dispatchers (collectively "officers") under the age of forty. The plan was implemented by the defendants on October 1, 1998, and revised by the defendants on March 1, 1999. Under the plan, those officers and dispatchers with five or fewer years of tenure with the department received proportionately greater raises when compared to their former pay than those with more than five years of tenure. As stated by the district court:

> The plan accordingly created three categories for the purposes of the analysis of this case: 1) those officers

and dispatchers with less than five years of tenure, most, if not all, of whom would have been under 40 years of age; 2) those 40 years of age or older, most, if not all, of whom would have had more than five years of tenure, and; 3) those under 40 years of age with more than five years of tenure.

On December 11, 2001, the plaintiffs moved to compel certain fiscal and personnel discovery related to the implementation and revision of the plan; the magistrate judge overseeing disputes related to discovery in this matter granted this motion on January 16, 2002, concluding that "the fiscal and personnel discovery requested by the Plaintiffs is not privileged . . . and should be produced." On June 5, 2002, the plaintiffs filed a "motion for sanctions, a default judgment, attorneys' fees and expenses, expert witness fees and a continuance," seeking to have the defendants comply with disclosure and discovery obligations as set forth in the Federal Rules of Civil Procedure and the order of the magistrate judge. Two days later, the defendants moved for summary judgment, and the plaintiffs thereafter moved to strike certain exhibits to the defendants' motion, in part because the existence of the documents attached as exhibits had been previously denied by the defendants.

On September 6, 2002, while the plaintiffs' motions were pending, the district court granted summary judgment in favor of the defendants on the plaintiffs' disparate impact and disparate treatment claims and denied the plaintiffs' pending motions as moot. Final judgment was entered on this same date.

The plaintiffs appeal this final judgment, maintaining that:

3

(1) the district court erred in concluding that a disparate impact theory of liability is not cognizable under the ADEA, and (2) the district court erred in improvidently dismissing the plaintiffs' disparate treatment claim pending production by the defendants of requested discovery materials.

## II.

### STANDARD OF REVIEW

We review the grant of summary judgment <u>de novo</u>, applying the same standards as did the district court. <u>Daniels v. City of Arlington</u>, 246 F.3d 500, 502 (5th Cir.), <u>cert. denied</u>, 534 U.S. 951 (2001). Summary judgment should be granted if there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In determining if there is a genuine issue of material fact, this court reviews the evidence in the light most favorable to the non-moving party. <u>Daniels</u>, 246 F.3d at 502.

## III.

### THE PLAINTIFFS' DISPARATE IMPACT CLAIM

The plaintiffs raise both disparate treatment and disparate impact theories of liability here. Regarding their disparate treatment claim, the plaintiffs allege that the defendants were motivated by age to implement a plan that discriminated against them intentionally. Regarding their disparate impact theory, the plaintiffs allege that the implementation of the facially neutral plan by the defendants gives rise to liability without a showing of intentional age motivation because the plan resulted in pay

4

increases to officers under forty years of age that were four standard deviations higher than the raises received by officers over forty. In support of their disparate impact theory, the plaintiffs proffered to the district court statistical data demonstrating that the average pay increases made pursuant to the plan differed by age and that older officers received smaller raises than their younger counterparts.

In a disparate treatment case, liability depends on whether the protected trait – here, age – actually motivated the employer's decision. <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993). The employer may have relied on a facially discriminatory policy requiring adverse treatment of older employees or may have been motivated by age to discriminate against an individual on an ad hoc basis – "[w]hatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." <u>Id.</u> Proof of discriminatory motive is thus critical to the success of a plaintiff's discriminatory treatment claim. <u>Id.</u> In contrast, in a disparate impact case, liability may result without a demonstration of discriminatory motive. <u>Id.</u> at 609. Disparate impact claims arise from "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." <u>Id.</u> (quoting <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 335-36 n.15 (1977)).

5

In 1971, the Supreme Court held that plaintiffs may bring disparate impact claims under Title VII. Griggs v. Duke Power Co., 401 U.S. 424, 430-31 (1971). This judicial construction of the statute was codified by Congress in 1991 to make clear that such a theory was available to plaintiffs. See Civil Rights Act of 1991, Pub. L. No. 102-166, § 105(a), 105 Stat. 1071, 1074-75 (adding 42 U.S.C. § 2000e-2(k)).[1] The availability of a disparate impact theory under the ADEA, however, is not so clear. In Hazen Paper Co. v. Biggins, the Supreme Court expressly declined to weigh in on whether the ADEA entitles a plaintiff to bring a disparate impact cause of action, stating that "we have never decided whether a disparate impact theory of liability is available under the ADEA, and we need not do so here." 507 U.S. at 610 (internal citation omitted).

This express reservation has led to a debate amongst the courts of appeals regarding whether the ADEA, like Title VII, entitles a plaintiff to bring a disparate impact claim. Those

---

[1] We note that the same statute did not make a parallel amendment to the ADEA, although it did amend the ADEA in other ways. Some of our sister circuits have concluded that this omission (together with other factors) indicates a congressional intent that a disparate impact cause of action not be available under the ADEA. See Mullin v. Raytheon Co., 164 F.3d 696, 703 (1st Cir. 1999); Ellis v. United Airlines, Inc., 73 F.3d 999, 1008 (10th Cir. 1996). Such congressional inaction is susceptible of multiple interpretations, however, and so we should hesitate before we draw inferences from it. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306 (1988). The Civil Rights Act of 1991 was mainly aimed at overriding certain interpretations of Title VII, and so we do not find it especially probative with respect to the question before us today. Accordingly, our interpretation of the ADEA, set forth later in this opinion, rests on other grounds.

courts of appeals extending the holding in Griggs to the ADEA do so based on the textual similarities between the prohibitory sections of the ADEA and Title VII. See Frank v. United Airlines, Inc., 216 F.3d 845, 856 (9th Cir. 2000) (stating, post-Hazen, that "[w]e see no reason to depart from our conclusion . . . and we again hold that a disparate impact claim is cognizable under the ADEA"); Criley v. Delta Air Lines Inc., 119 F.3d 102, 105 (2d Cir. 1997) (following, without discussion, pre-Hazen law in stating that "in our circuit, we have recognized such a[] [disparate impact] action"); Smith v. City of Des Moines, 99 F.3d 1466, 1470 (8th Cir. 1996) (stating that "even if we believed that Hazen Paper cast doubt on the validity of [pre-Hazen case law], Houghton [a post-Hazen case] represents the law of this Circuit" and must therefore be followed). Those courts of appeals declining to hold that a disparate impact theory is cognizable under the ADEA recognize the significant textual overlap in the prohibitory sections of the ADEA and Title VII, but they also look beyond this similarity, examining the entire ADEA statute (and the purpose behind its enactment) and finding important differences between the ADEA and Title VII that counsel against extending the Griggs holding to the ADEA context. See Adams v. Fla. Power Corp., 255 F.3d 1322, 1325-26 (11th Cir.) (holding that disparate impact claims may not be brought under the ADEA, in part because "the history of the ADEA differs from the legislative history of Title VII, which the Supreme Court in Griggs relied on to find a cause of action for disparate impact"), cert. granted, 534 U.S. 1054 (2001), cert. dismissed, 535 U.S. 228

7

(2002); Mullin, 164 F.3d at 703 ("Congress never intended to make a disparate impact cause of action available under the ADEA."); Maier v. Lucent Tech., Inc., 120 F.3d 730, 735 (7th Cir. 1997) ("[S]uch a theory of liability [disparate impact] is not cognizable under the ADEA."); Ellis, 73 F.3d at 1001 ("[W]e hold that ADEA claims cannot be based on a disparate impact theory of discrimination.").[2]

After surveying the well-traversed arguments on either side of this debate, we hold that the ADEA was not intended to remedy age-disparate effects that arise from the application of employment plans or practices that are not based on age. Fundamental to our decision is the ADEA's express exception permitting employer conduct based on "reasonable factors other than age" – an exception absent from Title VII – and the inapplicability to the ADEA context of the policy justifications identified by the Supreme Court (in Griggs, 401 U.S. at 430-31) for recognizing a disparate impact cause of action in the Title VII context.

## A. Similarities Between the ADEA and Title VII

---

[2] After Hazen, the Third and the Sixth Circuits have both expressed "considerable doubt" regarding whether a claim of age discrimination may be stated under a disparate impact theory. Lyon v. Ohio Educ. Ass'n & Prof'l Staff Union, 53 F.3d 135, 139 n.5 (6th Cir. 1995) ("The Court's focus in Hazen Paper on Congress's intent to prevent discrimination based on inaccurate and damaging stereotypes suggests that incidental discriminatory effects arising from facially age-neutral policies are not redressable."); DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 732 (3d Cir. 1995) (opinion of Greenberg, J.) (stating that "the analysis in Hazen casts considerable doubt on the viability of the theory"). However, in neither case was the issue directly before the court.

The construction of a statute begins with the text of the statute itself. The ADEA prohibits discrimination on the basis of age. See 29 U.S.C. § 623 (2000). It was enacted in 1967, before the Supreme Court first interpreted Title VII to allow employees to prove discrimination by showing disparate impact. See Griggs, 401 U.S. at 431. The plaintiffs correctly identify the core sections expressly prohibiting discrimination "because of [an] individual's age" in the ADEA – § 623(a)(1) and (a)(2) – as overlapping almost identically with the core sections expressly prohibiting discrimination "because of [an] individual's race, color, religion, sex, or national origin" in Title VII – 42 U.S.C. § 2000e-2(a)(1) and (2).[3] This is no coincidence; "the prohibitions of the ADEA

---

[3] Section 623's prohibitory subsections provide, in relevant part, that it is unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age . . . .

29 U.S.C. § 623(a)(1)-(2). The prohibitory subsections of Title VII provide, in relevant part, that it is unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would

9

were derived <u>in haec verba</u> from Title VII." <u>Lorillard v. Pons</u>, 434 U.S. 575, 584 (1978). The only differences in the prohibitory language contained in these statutes are: (1) Title VII protects against discrimination on the basis of "race, color, religion, sex, or national origin," while the ADEA protects against discrimination on the basis of "age"; and (2) Title VII extends protection also to "applicants" for employment, while the ADEA does not.

Although the ADEA's prohibitory provisions are at first blush read most naturally as outlawing only conduct motivated by age – the statute refers to actions taken "because of" age – <u>Griggs</u> of course held that parallel language in Title VII prohibited actions that had a race-disparate impact, irrespective of motive or intent. The significant overlap between the prohibitory sections of the ADEA and of Title VII persuaded the Second Circuit to hold early on, with little discussion, that a disparate impact theory of liability is likewise available under the ADEA. See <u>Geller v. Markham</u>, 635 F.2d 1027, 1031-32 (2d Cir. 1980).[4] The Eighth and Ninth Circuits soon followed suit, again without any significant

---

deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1)-(2).

[4] Then-Justice Rehnquist dissented from the denial of certiorari in <u>Geller</u>. 451 U.S. 945 (1981). In so doing, he stated that "[i]n my opinion, the decision of the Court of Appeals is inconsistent with the express provisions of the ADEA and is not supported by any prior decision of this Court." <u>Id.</u> at 947.

inquiry apart from drawing a parallel to Title VII.  See Leftwich

v. Harris-Stowe State Coll., 702 F.2d 686, 690 (8th Cir. 1983);

Douglas v. Anderson, 656 F.2d 528, 531 n.1 (9th Cir. 1981).[5]  As

noted earlier, these circuits continue to follow that position.[6]

   While the First, Seventh, Tenth, and Eleventh Circuits have

likewise approached the statutory construction of the ADEA by

looking at the text of the ADEA, they have (we think correctly)

declined to limit their construction calculus solely to the

prohibitory sections of the ADEA and Title VII.  Instead, as we

explore below, they look to the entire statute and legislative

history of the ADEA to recognize important textual and policy-based

differences between the ADEA and Title VII that demonstrate an

intention on the part of Congress to allow for claims of

---

[5]      At around the same time, the EEOC issued new
interpretive guidelines for the conduct of ADEA cases.  We note
that one portion of those guidelines seems to be based on the
assumption that the Griggs framework applies to ADEA cases.  See
46 Fed. Reg. 47,724, 47,725 (1981) (Sept. 29, 1981) (amending 29
C.F.R. § 1625.7(d)).  Such guidelines are not entitled to Chevron
deference.  Christensen v. Harris County, 529 U.S. 576, 587
(2000); EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 256-58 (1991).
We are of course still bound to treat them as having persuasive
force, to the extent that they are thoughtfully considered.  See
Christensen, 529 U.S. at 587.  The guideline in question does not
purport to affirmatively establish that a disparate impact theory
is available.  Instead, it simply assumes, on the basis of
Griggs, that such a theory is available.  See 46 Fed. Reg. at
47,725.  Given the absence of significant analysis, and in light
of subsequent developments that have cast doubt on that
assumption, we do not believe that this administrative guidance
is convincing authority.

[6]      The Seventh Circuit, which had originally permitted
disparate impact suits under the ADEA, changed course after
Hazen.  See EEOC v. Francis W. Parker Sch., 41 F.3d 1073 (7th
Cir. 1994).

intentional age discrimination, but not for claims of disparate impact discrimination.

**B.  Differences Between the ADEA and Title VII**

*(1)  Section 623(f)(1) of the ADEA*

The ADEA's prohibitions against age discrimination in employment are qualified by several exceptions to employer liability set forth in § 623(f).  Pursuant to one of these exceptions, an employer can avoid liability under the ADEA if the adverse employment action is "based on reasonable factors other than age."  29 U.S.C. § 623(f)(1).[7]

Neither the "reasonable factors other than age" exception nor a parallel provision is found in Title VII.  Facially, the exception appears to serve as a safe harbor for employers who can demonstrate that they based their employment action on a reasonable non-age factor, even if the decision leads to an age-disparate result.  In a pre-Hazen dissenting opinion, Judge Easterbrook argues against recognizing a disparate impact theory of liability under the ADEA based on this "reasonable factors other than age"

---

[7]     Section 623(f)(1) provides, in relevant part:

It shall not be unlawful for an employer, employment agency, or labor organization –

(1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age . . . .

29 U.S.C. § 623(f)(1).

12

exception:

> [Section (f)(1)], which says that "reasonable factors other than age" may be the basis of decision – impl[ies] strongly that the employer may use a ground of decision that is not age, even if it varies with age. What else could be the purpose of this language? Surely it does not mean simply that "only age discrimination is age discrimination." "The prohibition and the exception appear identical. The sentence is incomprehensible unless the prohibition forbids disparate treatment and the exception authorizes disparate impact."

Metz v. Transit Mix, Inc., 828 F.2d 1202, 1220 (7th Cir. 1987) (Easterbrook, J., dissenting) (quoting Douglas Laycock, Continuing Violations, Disparate Impact in Compensation, and Other Title VII Issues, 49 L. & CONTEMP. PROBS. 53, 55 (1986)). Post-Hazen case law likewise reads the inclusion of the "reasonable factors other than age" exception to imply a congressional intent to remedy only intentional discrimination because of age through the passage of the ADEA. For example, the First Circuit states:

> A critical asymmetry in the texts of the ADEA and Title VII counsels convincingly against recognizing a disparate impact cause of action under the former statute . . . . This ["reasonable factors other than age"] proviso permits employers to utilize factors other than age as grounds for employment-related decisions that differentially impact members of the protected class (individuals between the ages of 40 and 69). When this exception is read with the ADEA's general prohibition against age-based discrimination, the resulting construction follows: it shall be unlawful to "discriminate against any individual . . . because of such individual's age," except when "based on . . . factors other than age." Thus, if the exception contained in section 623(f)(1) is not understood to preclude disparate impact liability, it becomes nothing more than a bromide to the effect that "only age discrimination is age discrimination."

13

Mullin, 164 F.3d at 701-02.  We too find that the inclusion of the "reasonable factors other than age" exception to the ADEA creates a critical "asymmetry" between the ADEA and Title VII.[8]  The addition of this broad exception to the ADEA, on its face, appears to preclude a disparate impact theory of liability under the ADEA; at a minimum, it amounts to a salient textual difference between the substantive liability provisions of the ADEA and Title VII – a difference not mentioned by any of the courts of appeals which have extended Griggs to the ADEA context.[9]

    While we believe that the "reasonable factors other than age" provision counsels against recognizing a disparate impact theory

_____

[8]     In his dissent from the denial of certiorari in Geller, then-Justice Rehnquist likewise focused on § 623(f)(1) to support his view that Congress did not intend that a disparate impact claim be cognizable under the ADEA:

> In my view, Congress did not intend the ADEA to have the restraining influence on local governments which will result from the decision below.  Congress revealed this intention in 29 U.S.C. § 623(f)(1), which provides that it shall not be unlawful for an employer to take any action otherwise prohibited "where the differentiation is based on reasonable factors other than age."

Geller, 451 U.S. at 948-49 (Rehnquist, J., dissenting from denial of cert.).

[9]     This difference between the statutes also means that the rule of in pari materia, heavily relied upon by our colleague in dissent, is largely inapplicable to this case.  For while we usually endeavor to give like language the same meaning, it is a cardinal rule of statutory interpretation that we are to consider the whole act, reading each section in light of the others. E.g., United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .").

14

under the ADEA, we would not go so far as to say that it rules out any alternative reading. As the dissent argues, the prohibitory section and the "reasonable factors other than age" clause could together be read as announcing a general rule that disparate impact is actionable but then carving out a defense for adverse impacts that can be justified as a business necessity. The dissent's position is, of course, essentially how the courts have treated claims under Title VII. We do not believe this course is open to us, however. This circuit long ago held that § 623(f)(1)'s "reasonable factors other than age" provision does not create an affirmative defense to liability; rather, it allows the defendant to bring forward evidence to negate the plaintiff's prima facie case. See Marshall v. Westinghouse Elec. Corp., 576 F.2d 588, 590-91 (5th Cir. 1978). Furthermore, whether or not § 623(f)(1) is technically treated as a defense, we do not think that the reference to "reasonable factors other than age" can be taken to mean that all practices having a disparate impact are illegal unless they meet the stringent requirements of "business necessity." Indeed, the Supreme Court has suggested a different meaning for the clause, stating that it "insure[s] that employers [are] permitted to use neutral criteria not directly dependent on age." EEOC v. Wyoming, 460 U.S. 226, 232-33 (1983) (emphasis added); cf. Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 88 (2000) ("The exception simply makes clear that '[t]he employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors

15

directly.'" (quoting Hazen, 507 U.S. at 611)). Therefore, we would not read the "reasonable factors other than age" clause as a limited derogation from a general prohibition against disparate impact. Instead, we believe that the soundest reading of the whole text is that the ADEA does not prohibit employers from taking actions based on non-age factors, except when those non-age factors are so related to age that they are mere proxies.[10] This reading of the text is also powerfully supported by the legislative history, to which we turn in Part III.B.2 of our opinion.

The conclusion that this "reasonable factors other than age" exception textually precludes a disparate impact theory of liability under the ADEA is arguably strengthened by the Supreme Court's treatment of a similar exception to the Equal Pay Act. The Equal Pay Act was originally enacted in 1963 (as an amendment to the Fair Labor Standards Act) to prohibit discrimination in wages based on gender. Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). Under subsection (d), entitled "Prohibition of sex discrimination," in Title 29, section 206, the Equal Pay Act contains an exception similar to the "reasonable factors other than age" exception found in the ADEA:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed,

---

[10] In order to resolve this case, we need not speculate on what such factors might be. The Supreme Court held in Hazen that adverse employment actions based on job tenure do not, without more, amount to disparate treatment based on age. 507 U.S. at 611-12.

16

> between employees on the basis of sex . . . except where
> such payment is made pursuant to (i) a seniority system;
> (ii) a merit system; (iii) a system which measures
> earnings by quantity or quality of production; or (iv) <u>a
> differential based on any other factor other than sex</u>:
> <u>Provided,</u> That an employer who is paying a wage rate
> differential in violation of this subsection shall not,
> in order to comply with the provisions of this
> subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1) (emphasis added).  The Supreme Court has interpreted this exception to preclude actions based on disparate impact theories under the Equal Pay Act.  See <u>County of Washington v. Gunther</u>, 452 U.S. 161, 169-71 (1981); <u>Los Angeles Dep't of Water & Power v. Manhart</u>, 435 U.S. 702, 710 (1978).  For example, in <u>Manhart</u>, a class action was brought on behalf of female employees of the Los Angeles Department of Water and Power challenging the Department's requirement that female employees make larger contributions to its pension fund than male employees.  435 U.S. at 704.  The requirement was based on a study of mortality tables which revealed that, on the average, the Department's female employees lived a few years longer than its male employees.  <u>Id.</u> at 705.  In footnote 20, Justice Stevens, writing for the Court, interpreted the "any factor other than sex" exception to the Equal Pay Act:

> A variation on the Department's fairness theme is the
> suggestion that a gender-neutral pension plan would
> itself violate Title VII because of its
> disproportionately heavy impact on male employees.  <u>Cf.
> Griggs v. Duke Power Co.</u>, 401 U.S. 424.  This suggestion
> has no force in the sex discrimination context because
> each retiree's total pension benefits are ultimately
> determined by his <u>actual life span</u>; any differential in
> benefits paid to men and women in the aggregate is thus

17

"based on [a] factor other than sex," and consequently immune from challenge under the Equal Pay Act . . . .

Id. at 710 n.20 (alteration in original).

The Court's willingness to find that the Equal Pay Act's "any factor other than sex" exception precludes disparate impact theories of liability under the Equal Pay Act is helpful to our statutory construction of the ADEA. Many provisions in the ADEA have their roots in the Fair Labor Standards Act and the Equal Pay Act. See, e.g., Lorillard, 434 U.S. at 577-82 (discussing the Fair Labor Standards Act as the "model" for the enforcement and remedial provisions to the ADEA). Although legislative history on § 623(f)(1) is slim, we find it likely that the ADEA's "reasonable factors other than age" exception was spawned from the Equal Pay Act's "any factor other than sex" exception, especially given that no parallel exception is found in Title VII.[11]

We recognize that the exceptions found in the ADEA and the Equal Pay Act are not identical. The most notable difference, emphasized by our colleague in dissent, is the inclusion of the

---

[11]    See Mack A. Player, Wards Cove Packing or Not Wards Cove Packing?  That Is Not the Question: Some Thoughts on Impact Analysis Under the Age Discrimination in Employment Act, 31 U. RICH. L. REV. 819, 833-34 (1997) ("Note the similarity of the Equal Pay Act and ADEA 'factor other than . . .' defenses. Guess the origins . . . . Until the mid-1970s the Secretary of Labor administered and enforced the Equal Pay Act.  The Secretary of Labor was charged by Congress . . . to prepare a report on age discrimination and recommend legislation to Congress.  The initial drafts of what eventually became the ADEA were thus prepared by the Secretary of Labor . . . . It would seem, therefore, that the Secretary who was then enforcing the Equal Pay Act, lifted language and concept from the Equal Pay Act and placed it in the ADEA.").

word "reasonable" in the ADEA's exception.  However, we, like the Eleventh Circuit in Adams, decline to infer from the inclusion of the word "reasonable" that Congress meant to create an implicit background rule that actions resulting in an age-disparate impact are as a general matter proscribed.  See 255 F.3d at 1325 n.6.  As we explained above, we believe the better reading is not that the clause acts as a limited defense against disparate impact claims but rather that the clause signals that impacts resulting from neutral criteria not directly dependent on age are not prohibited in the first place.  At the very least, we recognize the "reasonable factors other than age" exception as a clear textual difference between the ADEA and Title VII regarding employer liability – a distinction that, if nothing else, plainly contradicts the argument that the cognizability of a disparate impact claim under Title VII (as set forth in Griggs) controls the cognizability of a disparate impact claim under the ADEA.[12]

---

[12]    Before turning to the legislative history of the ADEA, we note that we do not share the dissent's view of the import of the Older Workers Benefit Protection Act, Pub. L. No. 101-433, 104 Stat. 978 (1990) ("OWBPA").  The OWBPA added a provision to the ADEA requiring employers in certain circumstances to provide laid off employees with data relating to the ages of employees who are laid off versus those who retain their jobs.  See 29 U.S.C. § 626(f).  According to the dissent, such statistics would have little use if the ADEA did not allow a disparate impact cause of action.  We would not draw that inference, however, for such statistical evidence is quite useful in disparate treatment cases.  See Teamsters, 431 U.S. at 339; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805 (1973); Anderson v. Douglas & Lomason Co., 26 F.3d 1277, 1285 (5th Cir. 1994).  Moreover, the legislative history of the OWBPA shows that Congress believed that such statistics would help to alert discharged employees to the possibility that they might have suffered disparate treatment based on age.  See H.R. REP. NO. 101-664, at 22 (1990) (expressing

19

*(2) Legislative History and Policy Considerations*

In addition to the § 623(f)(1) exception to the ADEA, strong policy considerations, revealed in the legislative history of the ADEA, underscore the differences between the ADEA and Title VII. Because the broad remedial purpose behind Title VII was central to the Court's statutory construction of Title VII in <u>Griggs</u>, the difference between the purposes behind the ADEA and Title VII is directly relevant to whether a disparate impact theory is cognizable under the ADEA.

Congress enacted the ADEA after receiving a 1965 report by the Secretary of Labor regarding the problems of older workers. <u>See</u> <u>EEOC v. Wyoming</u>, 460 U.S. at 230-31. For our purposes, it is significant that the Secretary's report finds "no evidence of prejudice based on dislike or intolerance of the older worker" and concludes that the main problem older workers faced in the workplace was arbitrary age discrimination — namely explicit age limitations — based on misconceptions about the abilities of older workers. U.S. Dep't of Labor, The Older American Worker: Age Discrimination in Employment 2, 6 (1965) (the "Report"), <u>reprinted in</u> EEOC, Legislative History of the Age Discrimination in Employment Act 16 (1981) (hereinafter Legislative History). The Report further specifically finds that the concept of age prejudice is unique and differs from the concept of

---

the concern that in large-scale layoffs, "an individual employee would not reasonably be expected to know or suspect that age may have played a role in the employer's decision, or that the program may be designed to remove older workers from the labor force").

20

race prejudice because the process of aging "is inescapable, affecting everyone who lives long enough," regardless of distinct social and economic environments. Id. at 6. The Report likewise distinguishes between "arbitrary discrimination" based on age and other institutional arrangements that have a disproportionate effect on older workers, finding that different solutions were appropriate for these different problems. Id. at 21-25; see also Mullin, 164 F.3d at 703 (describing the Report as "recommend[ing] that arbitrary discrimination be statutorily prohibited, but that systemic disadvantages incidentally afflicting older workers be addressed through educational programs and institutional restructuring").[13] These findings were "confirmed throughout the extensive factfinding undertaken by the Executive Branch and Congress" in conjunction with the enactment of the ADEA. EEOC v. Wyoming, 460 U.S. at 230-01.

On January 23, 1967, the Secretary transmitted to Congress

_____

[13] We recognize that the Report found that discriminatory practices were often "defended on grounds apparently different from their actual explanation." Report at 7. We disagree, however, with the dissent's conclusion that Congress therefore must have intended to create a cause of action for disparate impact. The practices to which the Report was referring were age limitations, a form of disparate treatment. See id. Age limitations were, in fact, the dominant form of arbitrary discrimination addressed in the Report. Such restrictions are "arbitrary," according to the Report, in that they are based on stereotype-driven assumptions about older workers rather than on older workers' actual abilities. Id. at 2, 8. When an employer's practices are motivated by neutral, non-age factors, however, "the problem of inaccurate and stigmatizing stereotypes disappears." Hazen, 507 U.S. at 611. The mischief identified in the Report is therefore more accurately targeted by a disparate treatment theory, not a disparate impact theory.

21

proposed legislation entitled "Age Discrimination in Employment Act of 1967." Letter from W. Willard Wirtz to Hon. John W. McCormack and Hon. Hubert H. Humphrey, Jan. 23, 1967, reprinted in LEGISLATIVE HISTORY at 62-63. In this letter, the Secretary notes that the bill "provides for attention to be given to institutional arrangements which work to the disadvantage of older workers," but that "[r]easonable differentiations not based solely on age . . . would not fall within the proscription" of the bill. Id. Instead, the Secretary recommended that "research . . . be undertaken and promoted with a view to reducing barriers to the employment of older workers." Id. at 63. The Report, this proposed bill, and subsequent factfinding by the Executive Branch and Congress led Congress to limit the purpose of the ADEA specifically "to prohibit[ing] arbitrary age discrimination in employment." 29 U.S.C. § 621(b).

In contrast to the refined purpose evidenced in the historical underpinnings of the ADEA's enactment, the Supreme Court's opinion in Griggs discusses Title VII's broad remedial purpose. The defendant company in Griggs instituted a policy of permitting incumbent employees who lacked a high school education to qualify for transfer from the labor and coal handling department to an "inside" department by passing two tests of general intelligence – "[n]either [of which] was directed or intended to measure the ability to learn to perform a particular job or category of jobs." 401 U.S. at 427-28. Prior to the effective date of Title VII, the defendant had instituted a policy of "restricting Negroes" to the

22

labor and coal handling department in 1965.  Id. at 427.

Chief Justice Burger, writing for the Court, held that Congress's objective in enacting Title VII was to "achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees."  Id. at 429-30.  Based on this objective, the Court held that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."  Id. at 430.

The cornerstone of Griggs's holding that disparate impact is cognizable under Title VII is thus the link between the history of educational discrimination on the basis of race and the use of that discrimination to continue to disadvantage individuals on the basis of their race.  Id. at 432 (stating that "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability"); see also Gunther, 452 U.S. at 178 (describing the "broad approach" of Title VII as aimed at "overcoming and undoing the effect of discrimination") (internal quotation marks omitted).  However, absent from the scope of the ADEA are the historical and remedial concerns that, in the Title VII context, led to the recognition of disparate impact claims directed at overcoming the consequences of past societal discrimination.

As Justice Stevens explained in his concurring opinion in

23

<u>Washington v. Davis</u>, 426 U.S. 229 (1976), it is "inappropriate simply to transplant . . . standards in their entirety into a different statutory scheme having a different history." <u>Id.</u> at 255 (Stevens, J., concurring). We heed this advice today and therefore follow the majority of circuit courts to have addressed this issue in holding that a disparate impact theory of liability is not cognizable under the ADEA. We find insufficient textual support for the recognition of a disparate impact theory of liability in the ADEA. Further, as we see it, the conclusion that the holding in <u>Griggs</u> should be extended to the ADEA context based on the similarities in the prohibitory sections of the ADEA and Title VII ignores important considerations. It ignores the existence of § 623(f)(1) – an express exclusion of employer liability that is present in the ADEA but not present in parallel form in Title VII – and it ignores the differing purposes behind the ADEA and Title VII.[14]

_____

[14] Although it was not essential to the Court's holding in <u>Hazen Paper Co.</u>, there is language in the opinion that supports our conclusion that a disparate impact claim is not cognizable under the ADEA. There, a discharged employee (who was 62) brought suit against his employers after they discharged him only a few weeks before his pension rights were to vest, contending that the employers' decision was motivated by his age. 507 U.S. at 606. The First Circuit affirmed the judgment for the plaintiff employee, entered by the district court consistent with the jury verdict in favor of the employee. <u>Id.</u> at 607. In so doing, the court of appeals gave "considerable emphasis" to the evidence of pension interference because, in the court of appeals's view, the jury could reasonably have found that age was inextricably intertwined with the decision to fire the employee before his pension rights vested. <u>Id.</u> The Supreme Court vacated this judgment. <u>Id.</u> at 617. Importantly, the employee did not base his claim for relief on a disparate impact theory of liability. <u>Id.</u> at 610. Nonetheless, in holding that "an

24

# IV.

## THE PLAINTIFFS' DISPARATE TREATMENT CLAIM

In contrast to the plaintiffs' disparate impact claim, the plaintiffs' disparate treatment claim is cognizable under the ADEA.

### A.    McDonnell Douglas Framework

We have interpreted the now-familiar McDonnell Douglas framework to apply to disparate treatment claims brought under the ADEA. Tyler v. Union Oil Co. of Cal., 304 F.3d 379, 395 (5th Cir. 2002). To make out a prima facie case of discriminatory treatment based on age, the plaintiffs are required to prove: (1) they are within the protected class; (2) they are qualified for the position; (3) they suffered an adverse employment decision; and (4) they were replaced by someone younger or treated less favorably than similarly situated younger employees (i.e., suffered from disparate treatment because of membership in the protected class). Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002); see also Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).

---

employer does not violate the ADEA just by interfering with an older employee's pension benefits that would have vested by virtue of the employee's years of service," id. at 613, the Court stated that "[d]isparate treatment . . . captures the essence of what Congress sought to prohibit in the ADEA." Id. at 610. Further, the Court specifically discussed the decided purpose of the ADEA — i.e., to prevent "arbitrary" discrimination based on inaccurate stereotyping regarding older workers: "When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is." Id. at 611 (emphasis omitted).

If the plaintiffs make out their prima facie case, then the burden of production shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Tyler, 304 F.3d at 395. If the defendants meet this burden of production, the inference of discrimination drops, and the plaintiffs may then attempt to prove discrimination by offering evidence that the defendants' stated reason is pretextual. Id. ("In a disparate treatment case . . . a plaintiff must produce sufficient evidence to rebut a showing by the employer that there was a legitimate, non-discriminatory reason for [differentially treating] a particular employee.").

Here, the district court dismissed the plaintiffs' disparate treatment claim because the plaintiffs could not make out their prima facie case based on the evidence available to them at the time their responsive briefing was filed. The district court cited this evidence as consisting of: (1) evidence that the Personnel Director for the City of Jackson, Dr. George Terry, represented that the plan considered tenure only once; and (2) evidence that certain officers were subjected to age-related comments by Dr. Terry, Officer Deric Hearn, and Deputy Chief Cleon Butler. The district court additionally held that the plaintiffs' evidence, as a matter of law, was insufficient to disprove the defendants' legitimate nondiscriminatory reasons for their employment decision – to bring starting salaries for police officers up to the regional average, to develop a more generous pay scale within the confines of the city budget, and to consider tenure in the pay scale.

26

**B.    The Plaintiffs' Pending Motions**

When the district court dismissed the plaintiffs' disparate treatment claim, two motions were pending: (1) a "motion for sanctions, a default judgment, attorneys' fees and expenses, expert witness fees and a continuance," filed by the plaintiffs on June 5, 2002; and (2) a "motion to strike exhibits to defendants' motion for summary judgment," filed by the plaintiffs on July 11, 2002.

The June 5, 2002, motion sought comparative wage data relating to the plan, as originally implemented in October 1998 and as revised in March 1999.  It also sought to compel disclosure of any related fiscal and personnel discovery in accordance with the order of the magistrate judge granting the plaintiffs' motion to compel. Finally, the motion sought a continuance of the discovery period in order to allow the defendants to produce discovery materials previously requested and to allow the plaintiffs an opportunity to further develop their case based on this new evidence.

The July 11, 2002, motion sought to strike certain exhibits from the defendants' motion for summary judgment, in part because as to certain of these data produced as exhibits, "[t]he counsel for the Defendants [had] insisted that no such wage data existed," and "these data's purported existence and importance were never provided to the Plaintiffs until it was utilized by an Expert for the Defense."

Curiously, the district court did not rule on these motions. Instead, in deciding to grant the defendants' motion for summary judgment, the district court simply considered the evidence

available to the plaintiffs at the time of their responsive briefing. After granting summary judgment in favor of the defendants as to the plaintiffs' disparate treatment claim, the court then disposed of the plaintiffs' pending motions by stating that "[b]ecause the Court finds that Plaintiffs cannot meet their burden of proof for claims of disparate treatment under the ADEA, the other motions of Plaintiffs in opposition to the Motion of Defendant for Summary Judgment related to claims for disparate treatment are moot."

On appeal, the plaintiffs contend that the dismissal of their disparate treatment claim was premature because they "were not allowed to enforce their requests for discovery or to complete scheduled depositions that had been recessed when the plaintiffs learned that significant information had been willfully withheld from them."

## C. Analysis of the District Court's Conclusions

The district court may have conflated the plaintiffs' burdens of production and persuasion in concluding that the plaintiffs failed to meet their burden of demonstrating a genuine fact issue regarding their disparate treatment claim.[15] However, we need not

---

[15] For example, although not ultimately relevant to our determination on appeal, the district court required that the plaintiffs prove, as part of their initial prima facie burden, "unlawful motive" to discriminate because of age instead of requiring that the plaintiffs demonstrate replacement by someone younger or differential treatment of younger, similarly situated officers. See Sandstad, 309 F.3d at 897. The district court also appears to have used pre-Reeves case law in discussing the plaintiffs' ultimate burden of proving unlawful discrimination under the ADEA. See, e.g., Ross v. Univ. of Tex. at San Antonio,

28

address this issue because, upon review, we agree with the plaintiffs that summary judgment on the plaintiffs' disparate treatment claim was premature in light of the plaintiffs' pending motions before the district court, particularly given the allegation included in these motions that the defendants have failed to comply with the order of the magistrate judge.

The magistrate judge clearly ordered the defendants to turn over various discovery documents, including documents that were responsive to the plaintiffs' initial disclosure request. These documents apparently include the working papers used by city officials in drafting the new and revised plans, as well as evidence regarding comparative wage data – including memoranda and other documentation related to the March 1, 1999, City of Jackson Pay Plan Revision, signed by all pertinent department heads, the existence of which was initially denied by the defendants. The plaintiffs allege that this evidence provides additional documentation verifying the extent of the disparity between wage increases for officers under the age of forty and officers over the age of forty. The plaintiffs also allege that this evidence

_____

139 F.3d 521, 525 (5th Cir. 1998). As the Supreme Court stated in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000), "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Further, the district court here apparently declined, without discussion, to consider any of the plaintiffs' evidence that the plan resulted in a disparity of four standard deviations between workers over forty and workers under forty. Such statistical evidence can be relevant to a claim of intentional discrimination. See supra note 12.

provides them with documentation regarding the defendants'
knowledge that, at least at the time the defendants revised the
plan, the plan would result in inferior pay status for older
workers when compared to younger workers. This evidence appears to
us to be relevant to the plaintiffs' prima facie case and to their
ultimate burden required to counter the defendants' proffered
reasons for implementing the pay plan.[8] While much of this
evidence relates primarily to the plaintiffs' now-dismissed
disparate impact claim, the impact evidence may also support a
permissible inference of intentional discrimination and, as the
plaintiffs argue, may relate to whether one of the defendants'
proffered justifications – to bring salaries up to the regional
average – is false.

We do not decide whether the defendants have, in fact, failed
to comply with the magistrate judge's order, whether the motion to
continue discovery should be granted, or whether the plaintiffs'
other pending motions have merit. Rather, we simply hold that the
district court should have addressed these motions before it ruled,
on an apparently incomplete summary judgment record, that the
plaintiffs had not met their burden of demonstrating the existence
of genuine fact issues regarding their disparate treatment claim.
If the defendants did not comply with their discovery obligations

---

[8] Our ability to determine the degree to which this
requested evidence will ultimately benefit the plaintiffs is made
difficult by the absence in the record of the parties' briefs in
support of and against the defendants' motion for summary
judgment and the failure of the plaintiffs to request that these
briefs be supplemented to the record on appeal.

such that the plaintiffs were prohibited from presenting their best case to the district court, summary judgment in favor of the defendants improperly denied the plaintiffs an opportunity to continue discovery and supplement the record. Sunbelt Sav., FSB v. Montross, 923 F.2d 353, 357, 358 (5th Cir. 1991) (holding that summary judgment was premature when discovery was still pending).

The history of the discovery disputes plaguing this case and the existence of pending motions alleging that the plaintiffs' ability to present their best case was significantly hindered by the defendants' failure to comply with their discovery obligations convinces us that the summary judgment dismissal of the plaintiffs' disparate treatment claim was premature. On remand, the district court may want to take into account, in ruling on the pending motions, our decision on the viability of the disparate impact claim.

## V.

## CONCLUSION

We AFFIRM in part, VACATE in part, and REMAND the case to the district court. Costs shall be borne by appellees.

CARL E. STEWART, Circuit Judge, concurring in part, dissenting in part:

While I agree with the majority's disposition of plaintiff's disparate treatment claim in Part IV of the opinion, I also believe that the district court erred in improvidently dismissing the plaintiff's disparate impact claim and, therefore, I must dissent with regard to Part III.

This marks the first time our court has had to squarely decide, in the aftermath of Hazen Paper v. Biggins, 507 U.S. 604 (1993), whether a disparate impact claim may be formulated under the ADEA. I, however, am not thoroughly convinced by the majority's attempt to distinguish between two statutes—the ADEA and Title VII—whose text is virtually the same, that Congress meant to imply a disparate impact claim to the latter, but to preclude such a claim in the former. Equally, I am not persuaded by the majority's emphasis on the "reasonable factors other than age" ("RFOA") exception. When Congress enacted the ADEA in 1967, the courts had yet to develop a disparate impact theory. Thus, at the time of enactment, it appears that Congress most likely intended the RFOA to apply solely to claims of disparate treatment. Based upon a close reading of the text, the relevant legislative history, subsequent legislative actions, and concerns of public policy, I submit that a proper interpretation of the ADEA allows a disparate impact cause of action.

I. STATUTORY INTERPRETATION OF THE ADEA

The majority's analysis begins with the premise that the RFOA exception of the ADEA facially appears as a safe harbor to employers. To the majority, the language of the RFOA exception clearly rejects the theory of disparate impact. The majority relies in part on a pre-Hazen dissent by Judge Easterbrook in Metz v. Transit Mix, Inc., for the proposition that the RFOA exception is "*incomprehensible* unless the prohibition forbids disparate treatment and the exception authorizes disparate impact." 828 F.2d 1202, 1220 (7th Cir. 1987) (emphasis added).

Contrary to the majority's conclusion, it is not at all clear from the text that the RFOA exception *has no alternative interpretation* other than to preclude disparate impact. The RFOA exception aside, the language of the ADEA and Title VII are similar in every other respect. Thus, I cannot conclude, in the absence of expressed language to the contrary, that Congress meant to apply the disparate impact theory to Title VII, but not to the analogous language of the ADEA. Until the United States Supreme Court expressly rules on this issue, I continue to believe that the majority viewpoint is in error. Despite the obvious similarities between Title VII and the ADEA, today's majority joins our fellow

33

courts of the First,[9] Third,[10] Sixth,[11] Seventh,[12] Tenth,[13] and Eleventh[14] Circuits in disclaiming a disparate impact theory under the ADEA.

As shown through persuasive precedent from other circuits, however, there is another side to this debate.  For example, while acknowledging that post-Hazen the availability of disparate impact claims under the ADEA is unsettled among the circuits, the Second Circuit held that it "generally assesses claims brought under the ADEA identically to those brought pursuant to Title VII, including disparate impact."  Smith v. Xerox, 196 F.3d 358, 367 n.5 (2d Cir. 1999).  The Second Circuit is not alone.  The Eighth Circuit has also stated that it "continues to recognize the viability of . . . [ADEA disparate impact] claims."  Lewis v. Aerospace Cmty. Credit Union, 114 F.3d 745, 750 (8th Cir.1997); See also EEOC v. McDonnell Douglass Corp., 191 F.3d 948, 950 (8th Cir. 1999) (stating that "the law of this circuit is that disparate impact claims are

---

[9] Mullin v. Raytheon Co., 164 F.3d 696, 703-04 (1st Cir. 1999) cert. denied, 528 U.S. 811, 120 S. Ct. 44, 145 L. Ed. 2d 40 (1999).

[10] DiBiase v. Smithkline Beecham Corp., 48 F.3d 719, 732 (3d Cir. 1995).

[11] Lyon v. Ohio Educ. Ass'n and Prof'l Staff Union, 53 F.3d 135, 139 n.5 (6th Cir. 1995).

[12] EEOC v. Francis W. Parker School, 41 F.3d 1073, 1076-77 (7th Cir. 1994).

[13] Ellis v. United Airlines, Inc., 73 F.3d 999, 1006-07 (10th Cir. 1996).

[14] Adams v. Fla. Power Corp., 255 F.3d 1322, 1325 (11th Cir. 2001).

34

cognizable under the ADEA"). Thus, precedent from other circuits show that a contrary facial interpretation of the RFOA is reasonable.

Moreover, the strongest argument against the language of the RFOA exception precluding disparate impact lies in the substantive provisions of the ADEA and Title VII. In a similar case, a concurrence by Eleventh Circuit Judge Barkett acutely noted:

> [I]n every statutory discrimination case, a decision based upon legitimate business necessity will never support a claim for liability. Griggs itself recognized and repeatedly emphasized that disparate impact is a basis for relief only if the practice in question is not founded on "business necessity," or lacks "a manifest relationship to the employment." [401 U.S. 424, 430-31 (1971)]. [The RFOA exception] of the ADEA adds nothing new.
>
> . . . In light of the parallels between the substantive provisions of the ADEA and Title VII, and in light of the fact that Congress has amended the ADEA several times but has never explicitly excluded disparate impact claims, a reasonable interpretation of the [RFOA exception] is that it codifies the business necessity exception to disparate impact claims.

Adams, 255 F.3d at 1327-28 (Barkett, J., concurring).

35

I find Judge Barkett's reasoning fully persuasive. Under a theory of disparate impact, employers will still be able to have employment practices and policies that may burden over-age workers in a disproportionate way. These practices will be permissible, despite the disproportionate impact, provided the employer shows they are supported by a business necessity. Upon proving business necessity, the burden shifts to the employee to show that the practice in question was established not because of the legitimacy of the necessity, but merely as a pretext for invidious stereotyping. Therefore, I am not persuaded that adopting a disparate impact theory will lead to any inconsistencies with the RFOA exception.

That said, the cornerstone of the majority's holding relies on an analogous provision in the Equal Pay Act ("EPA"). Because the RFOA exception does not exist under Title VII, the majority looks instead to the EPA, which precludes disparate impact claims via its "any factor other than sex" language. The majority attempts to show that the similarities between the RFOA and EPA "any factor" exception should be construed by courts to demonstrate that the RFOA should similarly prohibit disparate impact. See Washington v. Gunther, 452 U.S. 161, 170 (1981) (juxtaposing the EPA's "any factor other than sex" language with Title VII's broadly inclusive prohibition against gender discrimination and stating that the language "confine[d] the application of the Act to wage differentials attributable to sex discrimination.").

36

The flaw in the majority's logic is that the terms "any" and "reasonable" are not synonymous.  Under the ADEA, an employer with a disparate impact policy may be liable for age discrimination if factors relied on were not reasonable.  Pursuant to the EPA, however, if an employment policy causes wage differences among men and women workers, the employer will not be liable unless the policy in question was based solely on gender.  Thus, the ADEA and EPA exceptions cannot be read to have the same meaning unless the word "reasonable" is omitted from the RFOA exception.  In this light, the premise of the majority opinion appears little more than ironic in that when it compares statutory language of the ADEA and Title VII to preclude disparate impact, the court advocates a dissimilar reading of almost identical statutes.  Yet, when comparing the ADEA to the EPA, with the intent of precluding disparate impact, the majority applies a similar reading of exceptions which differ significantly.  I disagree with the majority's analytical approach and its reading of <u>Gunther</u> as indicating that the ADEA cannot bar some "reasonable factors other than age" practices which have a disparate impact on workers over forty.

Additionally, the majority's contention that the ADEA and Title VII are not similar statutes, insofar as their application of the disparate impact theory, disregards the doctrine of *in pari materia*.  It has long been held that judicial interpretations of one statute may be informed by interpretations of similar statutes. <u>Lorillard v. Pons</u>, 434 U.S. 575, 580-81 (1978) ("[When] Congress

37

adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."). Under this well established statutory canon, "the interpretation of one statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships." Nat. Fed'n of Fed. Employees v. Dep't. of Interior, 119 S. Ct. 1003, 1013 (1999) (defining the doctrine of *in pari materia*, citing several cases where the Court applied this doctrine to aid in its construction of a variety of statutes, and arguing that the doctrine was now "well established") on remand, 174 F.3d 393 (4th Cir. 1999).

In the context of the ADEA and Title VII, adhering to this canon is particularly well suited because, as the majority concedes, the ADEA grew out of debates on Title VII. Furthermore, *in pari materia* has relevance because both aforementioned statutes apply to similar persons (here, the employees) and similar relationships (here, the employment context). Moreover, Congress carefully chose identical language for its statutes dealing with both discrimination against older workers and discrimination against those due to race or gender. Therefore, the majority should have applied the doctrine of *in pari materia* and interpreted the disparate impact theory as applicable to the ADEA.

## II. THE ADEA LEGISLATIVE HISTORY

38

My second point of disagreement with the majority concerns its portrayal of the legislative history of the ADEA. The majority opinion subtly recognizes that the legislative history of the ADEA is not directly on point. Although the majority's opinion properly recognizes that the Supreme Court's 1971 endorsement of the disparate impact theory in Griggs, 401 U.S. at 430-31, was later in time than Congress's enactment of the ADEA in 1967, the majority attempts to support its position by focusing on the underlying purposes of the legislation.

Although the language of Title VII and the ADEA are almost identical, the majority essentially dismisses Griggs as irrelevant to the calculus of age discrimination. The majority distinguishes Griggs from the ADEA on the grounds that Griggs interpreted Congress's intent underlying Title VII as sweeping in nature. The majority argues, "[i]n contrast to the refined purpose evidenced in the historical underpinnings to the ADEA's enactment, the Supreme Court's opinion in Griggs discusses Title VII's broad remedial purpose." While it is undoubtably true that Griggs recognized disparate impact theory as an available tool in the employment discrimination toolbox to remedy past discrimination under Title VII, it does not necessarily follow, as the majority asserts, that the disparate impact tool is available only in a remedial context.

I disagree in two respects with the majority's holding that disparate impact theory should be limited to the context of Title VII. First, the textual similarity between Title VII and the ADEA

39

evinces a congressional intent to provide similar protection against employment discrimination under the two statutes. Second, it is arguable whether historical discrimination should be a necessary precondition for recognizing a disparate impact theory. I acknowledge, as the majority does, that the ADEA and Title VII are distinct because the former lacks a history tied to past discrimination. In the absence of a clear statement to the contrary, however, I cannot assume that Congress intended to limit the remedial measures available under anti-discrimination statutes with almost identical language merely because the statutes arose out of distinct historical contexts. The Supreme Court in Griggs, for example, did not posit historical discrimination as the sole reason for disparate impact under Title VII; Griggs merely held that a showing of disparate impact was available to remedy this type of discrimination. See Jennifer J. Clemons and Richard A. Bales, ADEA Disparate Impact in the Sixth Circuit, 27 Ohio N.U. L. Rev. 1, 23 (2000). Moreover, the majority's emphasis on the historical posture of the ADEA and Title VII unduly minimizes the statutes shared aim of ridding from the workplace an environment of *concealed* discrimination. Griggs, 401 U.S. at 431 (stating that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"); EEOC v. Wyoming, 460 U.S. 226, 231 (1983) (stating that the ADEA seeks to remedy "arbitrary" forms of age discrimination "based in large part on stereotypes unsupported by objective facts, and often defended on grounds different from its actual causes"). Consistent

40

with such an aim, a disparate impact theory may be a plaintiff's only tool in counteracting sophisticated discrimination. Therefore, due to the similarity of the ADEA and Title VII language, it is my view that the protection available under both statutes, including that from disparate impact, should also be similar.

The majority ignores the fact that Griggs does not stand alone as the only relevant decision applying disparate impact theory. Under Supreme Court precedent, the disparate impact theory has grown beyond its original purpose of alleviating racial discrimination claims. See Dothard v. Rawlinson, 433 U.S. 321, 329-32 (1977) (applying disparate impact theory to Title VII sex discrimination claims). Furthermore, under the 1991 Civil Rights Act, 42 U.S.C. § 2000-e2(k)(1)(A)(I) (1994), disparate impact claims are readily available not only to plaintiffs alleging racial discrimination, but also to those claiming discrimination on the basis of gender, national origin, and religion.[15] In light of these

---

[15] Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, provides in pertinent part:

> Sec. 703. (k)(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if–
>
> (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity;

41

developments, I cannot agree with the majority that the ADEA must be limited solely to disparate treatment claims.

I also do not agree with the majority's interpretation of the most prominent documentation of all ADEA legislative history, the Wirtz Report.[16]  The majority uses the Report to bolster its argument that the ADEA was not premised on eradicating past discrimination.  The flaw with the majority's use of this most critical evidence of congressional intent is its failure to acknowledge the argument, embodied within the Wirtz Report, that age discrimination was in fact "based in large part on stereotypes unsupported by objective fact, and was often defended on grounds different from its actual cause."  See EEOC , 460 U.S. at 231. The aforementioned conclusion seems to indicate that the ADEA's purpose may not have been limited to eradicating animus, as the majority suggests.  Rather, and in contrast to the majority's view, the Wirtz Report indicates that Congress merely intended to utilize the ADEA to eliminate stereotypes that workers' productivity

---

. . . .

42 U.S.C. § 2000e-2 (2003).

[16]The term "Wirtz Report" refers to a congressional report commissioned by the former Department of Labor Secretary W. Willard Wirtz which, pursuant to section 715 of Title VII, instructed the Secretary of Labor to conduct a study with recommendations for "legislation to prevent arbitrary discrimination in employment because of age." The origins of the ADEA's rationales and objectives can be traced to the resulting report entitled, *The Older American Worker: Age Discrimination in Employment* (1965).  See also EEOC, 460 U.S. at 229-31 (tracing legislative history of the ADEA and central role of the Secretary of Labor Report).

42

declines with age. That said, I acknowledge that the Wirtz Report is supportive evidence of Congress's intent concerning the ADEA and that the Report did in fact distinguish age discrimination as "rarely based on the sort of animus motivating some other forms of discrimination." My position merely suggests that because the Wirtz Report sheds the best light on Congress's intent in enacting the ADEA, a point the majority does not refute, this Report arguably provides more support for affirming, rather than denying, that the ADEA contains a disparate impact cause of action.

Furthermore, the legislative intent indicating that Congress meant to allow the disparate impact theory in ADEA actions may be discerned from a Congressional amendment. In 1994, Congress amended the ADEA by adding the Older Workers Benefit Protection Act ("OWBPA"). 29 U.S.C. § § 623, 626, 630(f) (1994). The statute requires an employer to provide the employee with information regarding the ages of workers offered severance pay and those who were not let go before the employee waives any potential discrimination claims. 29 U.S.C. § 626(f)(1)(E)-(G), (H)(ii) (1994). These statistics, comparing the ages of those terminated and those retained, would be of little relevance if the employee could not bring a disparate impact claim. Therefore, the addition of the OWBPA is additional evidence that the disparate impact theory should be available under the ADEA.

## III. <u>CONCLUSION</u>

The majority today fails to heed the <u>Griggs</u> recognition that in a complex society, not all discrimination is apparent or overt.

Often, such discrimination will be subtle and concealed. The practical consequence of the majority's decision is that it will allow an employer to exclude older workers from lower-level jobs simply on the basis of pretext, without an additional tool at the employee's disposal to counteract such sophisticated discriminatory acts. Contrary to the majority's stance, I agree with the Supreme Court's determination in Hazen that the disparate impact liability was designed to detect employment decisions that reflect "inaccurate and stigmatizing stereotypes." 507 U.S. at 610. Thus, I find no incompatibility with using disparate impact theory to prove liability under the ADEA.

Instead, I am concerned that by not allowing a disparate impact cause of action under the ADEA, the majority has essentially held such plaintiffs to the heightened evidentiary standard of Washington v. Davis, 426 U.S. 229 (1976), where sophisticated and concealed discrimination must be proved solely through intentional acts. The majority, however, fails to fully absorb the spirit of Justice Stevens's concurrence in Davis that "the line between purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the court's opinion may assume." Id. at 254. Applied to our context, Justice Stevens's concurrence demonstrates that the majority's opinion, which distinguishes between intentional discrimination based on disparate treatment on the one hand and a disparate impact cause of action absent proof of intent on the other, may not be as clear as

44

the majority seems to opine.  Therefore, with regards to Part III of the majority opinion, I respectfully dissent.