# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00131-CV

**Texas Parks & Wildlife Department, Appellant**

**v.**

**Milburn Dearing; Kenneth Head; and Mike Warren, Individually, and on behalf of all others similarly situated, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. GN102867, HONORABLE JOSEPH H. HART, JUDGE PRESIDING

## O P I N I O N

This is an interlocutory appeal from the denial of a plea to the jurisdiction and the certification of a class action asserting disparate-impact liability for age discrimination under the Texas Commission on Human Rights Act (the "Act"). *See* Tex. Lab. Code Ann. § 21.051 (West 1996). Appellees Milburn Dearing, Kenneth Head, Mike Warren, and others (collectively Dearing)[1] brought a class-action lawsuit against their employer, the Texas Parks and Wildlife Department, asserting breach of contract and age discrimination resulting from the Department's reclassification of their game warden positions. The lawsuit sought a mandamus, damages, and declaratory and equitable relief. The Department filed a plea to the jurisdiction, asserting sovereign immunity and

---

[1] We will refer to Milburn Dearing by his full name when referring to him in his individual capacity.

Dearing's untimeliness and failure to exhaust administrative remedies. The district court granted the plea as to the contract, declaratory-judgment, and mandamus claims but denied it as to the age-discrimination claim. The district court also entered an order granting Dearing's motion for class certification of the age-discrimination claim. The Department appeals the denial of its plea and the class-certification order. We affirm the district court's denial of the Department's plea to the jurisdiction on the issues of timeliness and exhaustion of administrative remedies. We reverse the order certifying the class because we conclude that the only cause of action for which it was certified—a disparate-impact theory of liability for age discrimination—is not available under the Act.

**BACKGROUND**

Milburn Dearing and his fellow employees are employed by the Department as game wardens. Prior to 1994, there were four rungs on the Department's game-warden "career ladder"—Game Warden I through Game Warden IV. Game wardens advanced from one rung to the next every four years. The game warden advancements were based on years of service rather than a competitive, promotional process. Only the legislature could create an additional rung on the Department's ladder. In 1994, there were over a hundred game wardens at level IV, all with sixteen or more years of service at the Department. In an effort to provide additional compensation to these veteran game wardens, the Department reclassified 131 Game Wardens IV to the position "Field Sergeant Game Warden."[2] The position of "sergeant" already existed at the Department; thus no

_____

[2] There is evidence in the record to suggest that the Department's reclassification of the 131 employees fulfilled a return promise made by the Department or its former Executive Director,

2

legislative action was required for the reclassification. The Department created some additional duties for these newly classified sergeants, including the supervision of deer-decoy operations and training of new officers. In 1995, the legislature passed a pay-parity rider, which required that "[t]he Director of the Parks and Wildlife Department may not provide for the compensation of a state-commissioned peace officer at a rate less than the rate paid by any other state agency to a state-commissioned peace officer performing similar duties." *See* Act of May 25, 1995, 74th Leg., R.S., ch. 1063, 1995 Tex. Gen. Laws 5242, 5857 (effective Sept. 1, 1995). Several months after this bill was passed, the Department had done nothing to determine whether the Field Sergeant Game Wardens were being paid in parity with officers performing similar duties in other law enforcement agencies. After pressure from members of the legislature, the Department's Executive Director, Andrew Sansom, appointed a committee to study the pay-parity issue. The committee returned a finding that the Field Sergeant Game Wardens were performing similar duties to sergeants in the Department of Public Safety (DPS) and that the game wardens should therefore be compensated the same as the DPS sergeants. The Field Sergeant Game Wardens were then given a raise in early 1996.

In 1997, the legislature added a fifth rung to the game warden ladder—Game Warden V—and adopted Salary Schedule C, which designated that the Game Warden V position be compensated at the C-6 pay level. *See* Act of May 29, 1997, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 6341 (effective Sept. 1, 1997). In the same bill, the legislature also provided that

Andrew Sansom, to the Texas Game Warden Association in exchange for the Association's help with a legislative matter in 1993.

the adoption of Salary Schedule C could not result in a pay reduction for any classified employee, including game wardens. *See id.* at 6345 (the pay rider). As of the effective date of the 1997 bill, the Department reclassified the Field Sergeant Game Wardens to the newly authorized position of Game Warden V, because their duties matched the legislative description of Game Warden V. Moreover, as the only non-competitively acquired sergeant position in the Department, Field Sergeant Game Warden was therefore not a "true" sergeant position, but more appropriately another rung on the career ladder. However, because of the pay rider forbidding the reduction of any employee's pay, the so-called "grandfathered" Game Wardens V continued to be paid at their previous salary (equivalent to the then C-7 salary).

The appropriations act of 1999 created salary increases for all peace-officer positions in Texas. *See* Act of Apr. 23, 1999, 76th Leg., R.S., ch. 1589, 1999 Tex. Gen. Laws 5446, 6262-6263 (effective Sept. 1, 1999). On September 1, 1999, the Department ceased classifying the grandfathered Game Wardens V at the C-7 level and reclassified all employees in that group at the C-6 level. As a result, the reclassified Sergeant Game Wardens, formerly paid at the C-7 level of $42,084, received a salary increase to $44,600 (the new C-6 pay) instead of $51,600 (the new C-7 pay). It is this reclassification, from the C-7 to the C-6 level, that Dearing asserts was unlawful age discrimination.

Milburn Dearing filed a complaint with the Texas Commission on Human Rights on February 22, 2000, alleging that reclassification of the grandfathered Game Wardens V from the C-7 to the C-6 pay level constituted age discrimination because it had a disproportionate impact on

4

employees over the age of forty,[3] because none of the other sergeant positions at the Department were reclassified. The complaint asserted a class-action claim. The Commission accepted Milburn Dearing's complaint as timely; noted that the date of the discriminatory act was September 1, 1999; acknowledged that the complaint was a class-action claim; and issued Milburn Dearing a right-to-sue letter.

Dearing filed a class-action lawsuit in Travis County district court, alleging age discrimination and breach of contract, seeking a declaratory judgment that the Department violated the 1997 and 1999 appropriations acts, and seeking a mandamus to remedy the Department's abuse in downgrading the grandfathered game wardens to pay level C-6. Dearing also filed a motion to certify the class, defined as "all Field Sergeant Game Wardens employed by the Texas Parks and Wildlife Department on September 1, 1999 who were reclassified from pay group C-7 to pay group C-6 and from Field Sergeant Game Warden to Game Warden V."

The Department filed a plea to the jurisdiction, asserting that (1) the age-discrimination claim was barred because the complaint filed with the Commission was untimely, plaintiffs failed to exhaust administrative remedies, and the reclassification was legislatively mandated; (2) the breach-of-contract claim was barred due to sovereign immunity; (3) the mandamus claim could not stand because a mandamus is an extraordinary remedy to be used only when there is no other adequate remedy at law, and plaintiffs had asserted various other causes of action sufficiently adequate; and (4) the declaratory-judgment claim could not stand alone as a cause of

---

[3] Section 21.101 of the Act provides that discrimination on the basis of age is prohibited against individuals age forty or older. *See* Tex. Lab. Code Ann. § 21.101 (West 1996).

5

action because the Texas Uniform Declaratory Judgments Act is merely a procedural device for deciding cases already within the court's jurisdiction. The Department also filed a motion for summary judgment on four grounds: (1) Milburn Dearing did not file a timely complaint with the Commission; (2) Milburn Dearing did not file the lawsuit within the statute of limitations; (3) Milburn Dearing did not exhaust administrative remedies; and (4) the reclassification at issue was the result of a legislative mandate.

After a hearing, the district court granted the Department's plea to the jurisdiction on the breach-of-contract, declaratory-judgment, and mandamus claims but denied it as to the age-discrimination claims. It denied the Department's summary-judgment motion.[4] The court also granted Dearing's motion for class certification. The certification order decreed the trial plan for the case: "the issues remaining to be tried in this case are: (a) Plaintiffs' disparate impact claims for age discrimination in violation of Tex. Labor Code Ann. § 21.051 [and defendants' affirmative defenses]." The Department brought this interlocutory appeal,[5] challenging the court's order certifying the class and denial of its plea to the jurisdiction.

---

[4] The Department's summary-judgment motion also asserted official immunity on the part of Andrew Sansom, the Department's Executive Director at the time of the relevant actions underlying the suit. The district court granted summary judgment in favor of the Department on this ground only.

[5] Although only final judgments are typically appealable, certain interlocutory orders are appealable by statute, including orders certifying or refusing to certify a class and orders granting or denying a governmental unit's plea to the jurisdiction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(3), (8) (West Supp. 2004).

DISCUSSION

**I.    Plea to the jurisdiction**

*Standard of review*

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a specific cause of action. *Rylander v. Caldwell*, 23 S.W.3d 132, 135 (Tex. App.—Austin 2000, no pet.). In order to prevail, the party asserting the plea to the jurisdiction must show that even if all the allegations in the plaintiff's pleadings are taken as true, there is an incurable jurisdictional defect apparent from the face of the pleadings, rendering it impossible for the plaintiff's petition to confer jurisdiction on the trial court. *See id.* Because subject-matter jurisdiction presents a question of law, we review the district court's decision *de novo. Id.* In reviewing a trial court's ruling on a plea to the jurisdiction, we do not look at the merits of the case; rather, we "construe the pleadings in favor of the plaintiff," look to the pleader's intent, and accept the pleadings' factual allegations as true. *Id.* "The truth of the plaintiff's allegations is at issue only if the defendant pleads and proves that the allegations were fraudulently made to confer jurisdiction on the court." *Id.* Further, "a court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

*Timeliness of complaint*

The Department argues that its plea to the jurisdiction should have been granted because Dearing did not timely file his administrative complaint with the Texas Commission on Human Rights, a prerequisite to suit. *See Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490,

491-92 (Tex. 1996). A complaint with the Commission must be filed no later than 180 days after the alleged unlawful employment practice occurred. Tex. Lab. Code Ann. § 21.202 (West 1996). A complaint filed with the Commission is mandatory and jurisdictional. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485-86 (Tex. 1991). In other words, a person claiming that an employer has violated the Act must file a complaint with the Commission and otherwise exhaust administrative remedies before filing a civil action alleging violations of the Act. *Id.* at 488. The complaint filed with the Commission must be filed within 180 days after the "alleged unlawful employment practice occurred," or the complainant's claim is time-barred. *DeMoranville*, 933 S.W.2d at 491-92.

Here, the alleged unlawful practice was the reclassification of the game wardens from C-6 to C-7, which occurred on September 1, 1999—the date on which the 1999 appropriations act took effect. Until that date, the Department did not have the authority to downgrade the grandfathered game wardens because such action would have resulted in a decrease in their pay, which was specifically prohibited in the 1997 appropriations act. *See* Act of May 29, 1997, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 634. Even though the Department may have made the decision to reclassify the wardens in early August 1999, as evidenced by an inter-office memorandum, it could not legally do so until the 1999 act became effective. Milburn Dearing's complaint was filed on February 22, 2000—within 180 days after the 1999 act's effective date of September 1.

Nonetheless, the Department argues that Dearing's complaint was untimely because the limitations period begins to run when the employee is informed of the allegedly discriminatory

8

employment decision, not when that decision comes to fruition or when the consequences of the act became most painful. *See id.* at 492-93. The Department asserts that Dearing knew of the reclassification by at least August 10, 1999, when he attended a mandatory meeting of game wardens held in New Braunfels. At this meeting, according to evidence submitted by the Department, the topic of reclassification "was discussed," and it was "made known to those in attendance" that the reclassification would become effective September 1, 1999. Alternatively, the Department asserts that Dearing knew of the reclassification as early as either the 1997 legislation or the 1999 legislation. Each of the three dates the Department asserts began the running of the limitations period would push Dearing's complaint out of the 180-day filing window and make it untimely. We disagree with the Department's assertion.

The statute clearly hinges the running of the limitations period on the date of the "unlawful employment action." *See* Tex. Lab. Code Ann. § 21.202. Although *DeMoranville* holds that the limitations period begins to run on the date the employee is *informed* of the unlawful action, that case concerned an employer's established company policy and unequivocal communication to the employee that the policy would be enforced as to her, rather than an employer's decision to take a future action based on new legislation giving it authority for the first time to do so. *See DeMoranville*, 933 S.W.2d at 492-93 (holding that employee's notification that she would be terminated if she did not return to work within one year of start of her medical leave began limitations period running, rather than date on which she was actually terminated). We find this distinction significant.

Furthermore, whether Dearing knew definitively of the reclassification prior to September 1 is a fact question. A trial court must accept the allegations in a plaintiff's pleadings as true, unless the defendant pleads and proves that they were fraudulently made to confer jurisdiction. *Bland*, 34 S.W.3d at 554. The only evidence in the record going to what Dearing knew prior to September 1 is slim and does not establish that Dearing knew of the reclassification at any time before it actually occurred, on September 1. We also conclude that it is unlikely any reasonable person in Dearing's position would have known prior to September 1 of the reclassification. *See Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 928 (Tex. 1996) (in wrongful termination case, statute of limitations begins running when employee receives unequivocal notice of termination or when reasonable person should have known of his termination). Lastly, the Commission accepted Dearing's complaint as timely and identified the date of discrimination as September 1, 1999. *See* Tex. Lab. Code Ann. § 21.202 (West 1996) (Commission must dismiss untimely complaint); *Gorges Foodservice Inc. v. Huerta*, 964 S.W.2d 656, 664 (Tex. App.—Corpus Christi 1997, no writ) (jury could rationally infer from Commission's issuance of right-to-sue letter that complaint was timely filed). We therefore hold that Dearing's complaint was timely filed with the Commission and overrule the Department's first issue.

### Single-filing rule

The Department next asserts that the district court erred in not granting its plea to the jurisdiction because none of the plaintiffs exhausted their administrative remedies prior to filing suit, depriving the district court of subject-matter jurisdiction. The Department argues that even if Milburn Dearing's complaint with the Commission was timely filed, none of the other plaintiffs filed

a complaint, and his complaint may not substitute for individual filings by each potential class member. Because we have concluded that Milburn Dearing's complaint was timely filed, we proceed to a discussion of whether the other plaintiffs may "piggyback" on his complaint, under the so-called "single-filing rule." *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1223 (5th Cir. 1995); *Anson v. University of Tex. Health Sci. Ctr.*, 962 F.2d 539, 540-41 (5th Cir. 1992).

Under federal law, the single-filing rule allows a plaintiff who has not filed a charge with the Equal Employment Opportunity Commission (EEOC) to piggyback on the EEOC complaint filed by another person who is similarly situated. *Mooney*, 54 F.3d at 1223. Two conditions must be met for one or more plaintiffs to join individual claims if the named plaintiff filed a timely administrative charge: the persons attempting to piggyback must be similarly situated to the person who actually filed the EEOC charge, and the charge must provide notice of the collective or class-wide nature of the charge. *Id.* Although no Texas court has had occasion to consider applying the single-filing rule to cases involving complaints filed with the Commission, "it is proper to look to interpretation of parallel federal laws" when interpreting the Act. *Stinnett v. Williamson County Sheriff's Dep't*, 858 S.W.2d 573, 576 (Tex. App.—Austin 1993, writ denied); *see also Austin State Hosp. v. Kitchen*, 903 S.W.2d 83, 87-88 (Tex. App.—Austin 1995, no writ) ("Because the Act seeks to promote federal civil rights policy and because Texas has little case law interpreting the Act, this Court looks to analogous federal law when appropriate.").

Section 21.201 of the Act provides support for the single-filing rule: "A person claiming to be aggrieved by an unlawful employment practice *or the person's agent* may file a complaint with the commission." Tex. Lab. Code Ann. § 21.201 (West 1996) (emphasis added).

11

We hold that, under this statute, a person's "agent" could reasonably include a class representative. The statute at issue in the federal cases provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination *has been filed* with the [EEOC]. Such a charge *shall be filed* . . . within 300 days after the alleged unlawful practice occurred." 29 U.S.C.A. § 626(d) (West 1999) (emphasis added); *Anson*, 96 F.2d at 541. The Texas statute, like the federal one, does not specifically include or exclude the single-filing rule. Because it is proper to look to interpretation of parallel federal laws, we adopt the single-filing rule fashioned by federal courts.

The policy behind the federal single-filing rule persuades us that it should apply to state complaints filed with the Commission:

> [I]t would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC. As long as the EEOC and the company are aware of the nature and scope of the allegations, the purposes behind the filing requirement are satisfied and no injustice or contravention of congressional intent occurs by allowing piggybacking.

*Mooney*, 54 F.3d at 1223 (internal quotations and citations omitted). We find that the same policy applies to a class-action suit filed under the Act when the single, filed complaint adequately puts the investigative agency and employer on notice of the extent of the allegations. It would be wasteful of resources for each of numerous plaintiffs to file separate complaints when the grievances are the same and one complaint could serve the same purpose. Here, there is no dispute that Milburn Dearing's complaint stated its intent to make the age-discrimination claim against the Department a class action. We hold that the single-filing rule applies to complaints filed with the Commission,

12

that all members of the purported class are similarly situated, and that Dearing's complaint adequately stated its class-action intent. We overrule the Department's second issue.

In a third issue, the Department asserts that its actions in reclassifying the Sergeant Game Wardens were legislatively mandated and that the legislature's actions were rationally related to a legitimate state interest, thus not subject to an attack based on age discrimination under *Kimel v. Florida Bd. of Regents*. *See* 528 U.S. 62, 83-84, 91 (2000) (noting that rational-basis review applies to age discrimination by states and holding that ADEA does not abrogate states' sovereign immunity from suit by private individuals). However, the Department's reliance on *Kimel* is misplaced because the Supreme Court explicitly noted that its holding did not foreclose plaintiffs' ability to sue states under state age-discrimination statutes. *Id.* at 91-92. Furthermore, the Department has not pointed us to any legislative or statutory references from which we can conclude that its reclassification actions were required by law. We therefore overrule this issue.

## II. Class Certification

### *Standard of review*

A trial court's decision to certify a class must be reviewed for an abuse of discretion, but a reviewing court must not indulge every presumption in favor of the trial court's ruling. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002). Although a trial court has discretion to rule on class-certification issues, and some of its determinations must be given the benefit of the doubt—like those based on its assessment of the credibility of witnesses, for example—the trial court's exercise of discretion cannot be supported by every presumption that can be made in its

13

favor. It is actual, not presumed, conformance with Rule 42 that must govern. *Id.* at 691; *Southwestern Ref. Co., Inc. v. Bernal*, 22 S.W.3d 425, 435 (Tex. 2000); *see* Tex. R. Civ. P. 42.

### *Disparate impact*

The trial court certified this class to bring an age-discrimination claim based on a disparate-impact theory of liability. The Department asserts that the class-certification order should be vacated because disparate-impact claims—the only cause of action for which the class was certified—are not viable under the Texas statute prohibiting age discrimination. In 1971, the United States Supreme Court held that disparate-impact claims may be brought under Title VII. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). Disparate-impact claims arise from "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977)). Under a disparate-impact theory, liability may result even without an employer's discriminatory motive; disparate-treatment claims, by contrast, require proof that age actually motivated the employer's decision. *Id.* at 609-10. Although *Griggs* made disparate-impact claims available under Title VII, the federal courts have struggled with the applicability of disparate-impact claims under the ADEA. Because the state statute directs us to follow judicial interpretation of the ADEA in determining the availability of a state disparate-impact theory, we must review this debate between the federal courts of appeal. But first we begin our discussion with a close examination of the Texas statute.

14

Dearing seeks to sue under section 21.051 of the Act. That section prohibits unlawful employment discrimination on the basis of race, color, disability, religion, sex, national origin, or age. *See* Tex. Lab. Code Ann. § 21.051. Section 21.122 of the act, which specifically addresses disparate-impact cases, reads:

> (a)  An unlawful employment practice based on disparate impact is established under this chapter only if:
>
> > (1)  a complainant demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of *race, color, sex, national origin, religion, or disability* and the respondent fails to demonstrate that the challenged practice is job-related for the position in question and consistent with business necessity[.]
>
> . . . .
>
> (b)  To *determine the availability of* and burden of proof applicable to *a disparate impact case involving age discrimination*, the court shall apply the judicial interpretation of the Age Discrimination in Employment Act of 1967 [ADEA] and its subsequent amendments (29 U.S.C. Section 621 et seq.).

*Id.* § 21.122 (West 1996) (emphasis added). Subsection (a), which establishes disparate-impact claims, glaringly omits employment practices based on age discrimination. Subsection (b) addresses age discrimination separately and hinges the availability of a disparate-impact cause of action on judicial interpretation of the analogous federal act, the ADEA. The legislature specifically parsed disparate-impact cases into two categories: those involving age discrimination, addressed in subsection (b), and those involving any of the six other unlawful acts of discrimination, covered in subsection (a). Thus, we must review "judicial interpretation" of the ADEA to determine whether a disparate-impact claim involving age discrimination is available under the Act.

15

The United States Supreme Court has not directly ruled on the availability of a disparate-impact cause of action for age discrimination under the ADEA. In *Hazen*, the Court focused on legislative intent to prevent age discrimination based on inaccurate and damaging stereotypes and declined to address disparate-impact claims: "[W]e have never decided whether a disparate impact theory of liability is available under the ADEA and we need not do so here." *See Hazen*, 507 U.S. at 609 (citation omitted). Nevertheless, *Hazen* cast some doubt on the future of disparate-impact claims. The Court noted that "disparate treatment . . . captures the essence of what Congress sought to prohibit in the ADEA." *Id.* at 610. The court continued, "[W]hen the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is." *Id.* at 611. Three concurring justices opined, "[T]here are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA." *Id.* at 618 (Kennedy, J., concurring). After *Hazen*, the United States Court of Appeals for the Seventh Circuit, which had originally recognized disparate-impact suits, reversed its position. *E.E.O.C. v. Francis W. Parker Sch.*, 41 F.3d 1073, 1076-77 (7th Cir. 1994). Both the Third and Sixth Circuits have expressed considerable doubt as to whether a disparate-impact claim based on age discrimination survives after *Hazen*, but in neither opinion was the issue squarely before the court. *See Lyon v. Ohio Educ. Ass'n*, 53 F.3d 135, 139 n.5 (6th Cir. 1995); *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 732 (3d Cir. 1995).

Those federal courts of appeal that have found disparate-impact claims available under the ADEA have based their determination on the similarity between the language in Title VII

16

and the ADEA. *See Criley v. Delta Airlines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997); *Lewis v. Aerospace Cmty. Credit Union*, 114 F.3d 745, 750 (8th Cir. 1997); *E.E.O.C. v. Local 350*, 998 F.2d 641, 648 n.1 (9th Cir. 1993). However, the majority of federal appellate courts have relied on distinctions in both the language and the legislative intent behind Title VII and the ADEA to hold that the disparate-impact theory crafted in *Griggs* is not actionable under the ADEA. *Mullin v. Raytheon Co.*, 164 F.3d 696, 700-01 (1st Cir. 1999), *cert. denied*, 528 U.S. 811 (1999); *Ellis v. United Airlines, Inc.*, 73 F.3d 999, 1006-07 (10th Cir. 1996); *Adams v. Florida Power Corp.*, 255 F.3d 1322, 1325-26 (11th Cir. 2001).

The United States Court of Appeals for the Fifth Circuit has recently joined this majority in concluding that a disparate-impact theory of liability is not actionable under the ADEA in this circuit. *See Smith v. City of Jackson, Miss.*, ___ F.3d ___, No. 02-60850, 2003 U.S. App. LEXIS 23125, at *34, (5th Cir. Nov. 13, 2003). We proceed to a consideration of the reasoning behind the holding in *Smith* and the opinions that it follows.

*Smith* begins by noting the similarity between the ADEA and Title VII, the statute that gave rise to the disparate-impact theory of liability based on race-disparate impact, regardless of motive. *Id.* at *11. The language of the ADEA closely parallels that of Title VII, indeed "the prohibitions of the ADEA were derived in *haec verba* from Title VII." *Lorillard v. Pons*, 434 U.S. 575, 584 (1978). It is this similarity that persuaded the Second, Eighth and Ninth Circuits to recognize disparate-impact claims under the ADEA. *See Geller v. Markham*, 635 F.2d 1027, 1031-32 (2d Cir. 1980); *Leftwich v. Harris-Stowe State Coll.*, 702 F.2d 686, 690 (8th Cir. 1983); *Douglas v. Anderson*, 656 F.2d 528, 531 n.1 (9th Cir. 1981). However, *Smith* reaches a different conclusion

17

by noting that the text of the ADEA differs from Title VII in an important respect: Section 623(f)(1) of the ADEA explicitly provides that an employer may "take any action otherwise prohibited . . . where the differentiation is based on reasonable factors other than age." *See* 29 U.S.C.A. § 623(f)(1) (West 1999); *Smith*, 2003 U.S. App. LEXIS 23125, at \*16-17. Neither this exception nor any parallel provision is found in Title VII. *See Smith*, 2003 U.S. App. LEXIS 23125, at \*16-17. As the Fifth Circuit recognized, this difference amounts to "a critical asymmetry" between the two statutes. *Id.*; *see also Adams*, 255 F.3d at 1325; *Mullin*, 164 F.3d at 701-02. When the "other reasonable factors" exception in the ADEA is read together with its general prohibition against age discrimination, the resulting construction follows: It is unlawful to "discriminate against any individual . . . because of such individual's age," except when that employment action is "based on . . . factors other than age." *Smith*, 2003 U.S. App. LEXIS 23125, at \*18 (citing *Mullin*, 164 F.3d at 702). The general prohibition and exception, read together, allow for discrimination against the protected age group if the discrimination is based on some factor other than age. The Fifth Circuit reasoned that, if the ADEA exception is not understood to preclude disparate-impact liability, "it becomes nothing more than a bromide to the effect that 'only age discrimination is age discrimination.'" *Id.* at \*18-19 (quoting *Mullin*, 164 F.3d at 702). "Such a circular construction would fly in the teeth of the well-settled canon that 'all words and provisions of statutes are intended to have meaning and are to be given effect.'" *Mullin*, 164 F.3d at 702 (citation omitted).

In support of this rationale, the Fifth Circuit notes the Supreme Court has held that a similar exception in the Equal Pay Act precludes disparate-impact claims under that act. *See County of Washington v. Gunther*, 452 U.S. 161, 169-71 (1981). Section 206(d)(1) of the Equal Pay

18

Act provides that wage discrimination on the basis of gender is prohibited, unless the wage "differential is based on any other factor other than sex." *See* 29 U.S.C.A. § 206(d)(1) (West 1998). Each of the federal circuits that has disallowed disparate-impact claims under the ADEA has relied on *Gunther*'s interpretation of the similar "any other factor" exception in the Equal Pay Act to cast doubt on the availability of disparate-impact claims under the ADEA. *See Smith*, 2003 U.S. App. LEXIS 23125, at *23-24; *Adams*, 255 F.3d at 1325; *Ellis*, 73 F.3d at 1008; *Mullin*, 164 F.3d at 702; *Francis W. Parker Sch.*, 41 F.3d at 1077. Although the ADEA exception references "*reasonable* factors other than age," while the Equal Pay Act omits the word reasonable, both the Fifth and Eleventh Circuits have found that the ADEA exception makes it more like the Equal Pay Act than Title VII, which has no such exception. *See Smith*, 2003 U.S. App. LEXIS 23125, at *27-28; *Adams*, 255 F.3d at 1325 n.6.

Secondly, *Smith* notes that the legislative history of the ADEA is different from that of Title VII. The ADEA was enacted after the Secretary of Labor issued a report on age discrimination recommending that Congress ban arbitrary discrimination, such as disparate treatment based on stereotypical perceptions of the elderly, but that factors affecting older workers, such as policies with disparate impact, be addressed in alternative ways. *Smith*, 2003 U.S. App. LEXIS 23125, at *31; *Mullin*, 164 F.3d at 702-03; *see* U.S. Dep't of Labor, The Older American Worker: Age Discrimination in Employment 2, 6, 21-25 (1965) (Congress should prohibit "arbitrary discrimination" based on age and age stereotypes, but factors that "affect older workers more strongly, as a group, than they do younger workers" should be addressed through programmatic measures to improve opportunities for older workers.). Title VII, on the other hand, had a broad

19

remedial purpose: To "achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs*, 401 U.S. at 429-30, *quoted in Smith*, 2003 U.S. App. LEXIS 23125, at *31-32; *Adams*, 255 F.3d at 1325-26 ("history of the ADEA differs from the legislative history of Title VII, which the Supreme Court in *Griggs* relied on to find a cause of action for disparate impact"); *Ellis*, 73 F.3d at 1008 ("legislative history of the ADEA suggests it was not enacted to address disparate impact claims"). "The cornerstone of Griggs's holding that disparate impact is cognizable under Title VII is thus the link between the history of educational discrimination on the basis of race and the use of that discrimination to continue to disadvantage individuals on the basis of their race." *Smith*, 2003 U.S. App. LEXIS 23125, at *33 (citing *Griggs*, 401 U.S. at 432). "[A]bsent from the scope of the ADEA are the historical and remedial concerns that, in the Title VII context, led to the recognition of disparate impact claims directed at overcoming the consequences of past societal discrimination." *Id.*

This distinctive legislative intent to allow disparate-impact claims for Title VII discrimination but not necessarily for age discrimination is further revealed by comparing subsequent amendments to Title VII and the ADEA. Congress explicitly added a disparate-impact cause of action to Title VII in the 1991 Civil Rights Act. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1074-75 (1991) (codified at 42 U.S.C.A. § 2000e-2(k) (West 2003)) (hereinafter cited as Civil Rights Act of 1991); *see Ellis*, 73 F.3d at 1008; *Mullin*, 164 F.3d at 703. Although we can understand little of legislative intent from a body's failure to act, Congress added no such parallel provision to the ADEA, despite its amendment of other portions of the ADEA. *See, e.g.*,

Civil Rights Act of 1991 at 115, 105 Stat. at 1079 (amending time period within which an employee may file civil actions); Civil Rights Act of 1991 at 302(2), 105 Stat. at 1088 (extending coverage of ADEA to congressional employees). While courts should ordinarily "tread slowly in premising statutory construction on the action (or inaction) of subsequent Congresses . . . [,]what transpires in a later legislative session sometimes constitutes a useful source of guidance in statutory interpretation cases." *Mullin*, 164 F.3d at 703 (citations omitted). Therefore, "Congress'[s] insertion of an express provision for a disparate impact cause of action in Title VII renders the absence of such a provision in the ADEA—which was undergoing revision at the same time by the same committees and in the same bill—highly significant."[6] *Id.*

Dearing insists that the reasoning of the *Smith* court is irrelevant because, unlike the federal scheme, the Texas legislature chose to prohibit age discrimination in the same statute that prohibits discrimination based on race, color, sex, national origin, religion, or disability, and thus disparate-impact claims should apply equally to all claims of discrimination. Dearing would have us ignore section 21.122, which states that disparate-impact claims are available for age discrimination in this state only if they are available under the ADEA. *See* Tex. Lab. Code Ann. § 21.122. Furthermore, the language in the Act—added in 1995—mirrors the language added to Title VII in 1991 codifying disparate-impact cases under Title VII, except that the Texas Act treats disparate impact on the basis of age distinctly by removing it from the list of other forms of

---

[6] The Fifth Circuit did not accord much significance to the congressional inaction in adding a disparate-impact claim to the ADEA but merely noted in passing the distinction with Title VII. *Smith v. City of Jackson, Miss.*, ___ F.3d ___, No. 02-60850, 2003 U.S. App. LEXIS 23125, at *7 n.1, (5th Cir. Nov. 13, 2003).

21

discrimination that give rise to disparate-impact liability. *Compare* Tex. Lab. Code Ann. § 21.122, *with* 42 U.S.C.A. § 2000e-2(k) (West 2003). We conclude, therefore, that the textual distinction between the ADEA and Title VII noted in *Smith* is specifically mirrored in the Act. *Smith* has declared that disparate-impact claims may not be redressed under the ADEA in this circuit. *See Smith*, 2003 U.S. App. LEXIS 23125, at *34. We find the reasoning of the Fifth Circuit persuasive and hold that there is no disparate-impact theory of liability under the Texas Act.[7]

The trial plan contained in the district court's order certifying the class states that the plaintiffs' disparate-impact claims for age discrimination and the defendants' affirmative defenses to such claims are the only issues remaining to be tried in this class action. Because the only certified class-action claim may not be redressed under the Act, the certification order is therefore vacated, and the cause is remanded for further proceedings consistent with this opinion. *See Warner-Lambert Co. v. Mills*, 117 S.W.3d 488, 494 (Tex. App.—Beaumont 2003, no pet. h.) (holding that causes of action for which class was certified were preempted by federal law and thus court lacked subject-matter jurisdiction to certify class).[8]

---

[7] Dearing argues that this Court is not bound by Fifth Circuit precedent on issues of federal law. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993); *Barstow v. State*, 742 S.W.2d 495, 500-01 n.2 (Tex. App.—Austin 1987, writ denied). While we acknowledge the holdings of *Penrod* and *Barstow*, we find that the overwhelming majority of "judicial interpretation" of the ADEA is in accord with the decision reached in *Smith*.

[8] Because we reverse the order certifying the class on jurisdictional grounds, we do not reach the Department's final issue of whether the plaintiffs have met the numerosity, commonality, predominance, and superiority requirements of Rule 42. *See* Tex. R. Civ. P. 42.

**CONCLUSION**

The district court's denial of the Department's plea to the jurisdiction was proper because Milburn Dearing's complaint was timely filed with the Commission on Human Rights and, under the single-filing rule, met the filing requirements for the other class members. However, because the only cause of action for which the class was certified, a disparate-impact theory of liability, is not available under the Texas Commission on Human Rights Act, we reverse the class certification and remand the cause to the district court for further proceedings consistent with this opinion.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Patterson

Affirmed in Part; Reversed and Remanded in Part

Filed:   January 8, 2004

23